UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

# JS-6

Present: The Honorable  STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

Proceedings:   IN CHAMBERS ORDER GRANTING PLAINTIFF'S MOTION TO REMAND [13]

**Introduction**

On January 22, 2015, plaintiff Rosario J. Lopez ("Lopez" or "Plaintiff") filed this putative wage-and-hour class action against PVH Neckware ("Neckwear") and PVH Corporation ("Corp.") (collectively the "Defendants") in Los Angeles Superior Court. Dkt. 1. Plaintiff seeks to bring the action on behalf of herself and "all other current and former similarly situated employees employed by or formerly employed by PVH CORP. and PVH NECKWEAR, INC. and any subsidiaries or affiliated companies . . . within the State of California." Compl. ¶ 1. In her complaint, Plaintiff advanced several claims under California law: (1) failure to pay overtime wages; (2) failure to pay minimum wages; (3) failure to provide meal periods; (4) failure to provide rest periods; (5) failure to provide accurate wage statements; (6) failure to pay all wages upon termination; (7) violation of California's Unfair Competition Law ("UCL"). *Id.* ¶¶ 30–77. Plaintiff requested damages, penalties, restitution, pre-judgment interest, costs, and attorney's fees under California law. *Id.* at 16–17.

On March 26, 2015, Defendants filed a notice of removal, removing the case to this Court. Dkt. 1. Defendants asserted jurisdiction was proper under the Class Action Fairness Act ("CAFA"). *Id.* On April 17, 2015, Plaintiff filed a motion to remand the case to state court. Dkt. 13.

For the reasons discussed below, the Court GRANTS Plaintiff's motion to remand.

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

**Statement of Facts**

Plaintiff asserts that for at least the four years prior to the filing of the lawsuit Defendants "had a consistent policy of failing to pay wages, including overtime wages, to Plaintiffs and other non-exempt employees in the State of California in violation of California state wage and hour laws as a result of, including but not limited to, implementing a practice and/or procedure that unevenly rounds time worked, thereby depriving employees of overtime and minimum wage compensation." Compl. ¶ 2. Defendants are also alleged to have had a "consistent policy" of failing to provide meal breaks and rest breaks. *Id.* ¶¶ 3–4. Finally Plaintiff alleges that Defendants "have failed to pay" full wages owed to employees upon termination based on a "policy and practice of issuing wage statements that do not show, including but not limited to, pay due and owing for meal and rest break law violations and payment and hours worked that were not paid. *Id.* ¶¶ 5, 58.

In support of removal, Defendants have offered declarations from two human resources executives and thirteen store managers.

*Human Resources Declarations*

<u>Neckwear</u>

Patricia C. Winkler is a Senior Director of Human Resources at Neckwear. Winkler Decl. ¶ 1. She has held her current position since June 2014 and has been a Director of Human Resources at Neckwear since 2007. *Id.* Neckwear is a Delaware corporation in the business of manufacturing and distributing neckties. *Id.* ¶¶ 2, 4. Neckwear directs its business from its headquarters and executive offices in New York. *Id.* ¶¶ 3–4. Winkler is familiar with the timekeeping policies at Neckwear because of the nature of her position. *Id.* ¶ 6. Their policy is to round an employee's time clock entry to the nearest quarter hour time (either up or down). *Id.* According to Winkler, non-exempt employees are "almost always" scheduled to work eight hours per day. *Id.* ¶ 7. Some employees have worked overtime during the last four years. *Id.* When an employee works overtime, he or she will "occasionally" work more than ten hours of overtime. *Id.* Neckwear employees are issued a paycheck each week for the preceding week's work. *Id.* ¶ 8.

Winkler asked her staff to compile payroll and human resources records related to this lawsuit. *Id.* ¶ 5. From these records, she determined that 407 non-exempt employees have worked at Neckwear

:  _____

Initials of Preparer    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

since January 22, 2011. *Id.* On average, Neckwear has employed 274 non-exempt employees since January 22, 2014. *Id.* Since January 22, 2012, approximately 85 employees have ended their employment with Neckwear. *Id.* Over the last four years, the average non-exempt employee earned $12.51 per hour. *Id.*

Corp.

Carla David is the Vice President of Retail and Human Resources Administration at Corp. David Decl. ¶ 1. She has held her current position since May 2012. *Id.* Corp. is a Delaware corporation with headquarters and executive offices located in New York. *Id.* ¶¶ 2–4. According to David, Corp. operated approximately 24 retail stores in California in February 2015. *See id.* ¶ 5. Most of the non-exempt employees at Corp. are retail employees. *Id.* David is familiar with the timekeeping policies at Corp. because of the nature of her position. *Id.* ¶ 6. Their policy is to round an employee's time clock entry to the nearest quarter hour time (either up or down). *Id.* When the employee works one to seven minutes beyond the quarter hour mark, the time is rounded down. *Id.* When the employee works eight to fourteen minutes over the quarter hour mark, the time is rounded up. *Id.* Corp. employees are issued a paycheck each week for the preceding week's work. *Id.* ¶ 7.

David asked her staff to provide her with payroll and human resources records compiled in the regular course of business for the purpose of her declaration. *Id.* ¶ 6. From these reports, she concluded that Corp. has employed approximately 1,888 non-exempt employees in California since January 22, 2011. *Id.* In March 2015, Corp. employed approximately 278 non-exempt employees in California. *Id.* Since January 22, 2012, approximately 1,407 employees have ended their employment with Corp. *Id.* The average number of employees working for Corp. between January 22, 2014 and May 4, 2015 was 562. *Id.* And over the last four years, the average non-exempt employee earned $9.31 per hour. *Id.*

*Store Manager Declarations*

Monica Schneider is a Store Manager at Corp. Schneider Decl. ¶ 2. She has worked for Corp. for over twelve years, as of the date of her declaration on February 11, 2015. *Id.* ¶ 3. Her declaration provides that she was aware that employees are entitled to meal breaks, store managers tell associates that about the policies, and all employees are aware that they need to take meal breaks by their fifth hour of work. *Id.* ¶ 13. She monitors employees to make sure that they take their meal breaks and instructs them to take all meal and rest breaks. *Id.* ¶ 15. When she is not working, her assistant managers take on this

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

responsibility. *Id.* She has never asked an employee to skip a meal break and her store "does not have issues with employees missing meal or rest breaks." *Id.* ¶ 16. The store provides 15-minute rest breaks and store managers instruct employees to take their meal breaks. *Id.* ¶ 17. Her store has 13 employees, comprised of one manager, two full-time assistant managers, two part-time floor supervisors, one lead stock manager, and seven sales associates. *Id.* ¶ 4. Managers typically work 8-hour shifts, floor supervisors usually work 6-hour shifts, and sales associates at her store usually work 5-hour shifts. *Id.* ¶ 12.

Veronica Ramirez is a Store Manager at Corp. Ramirez Decl. ¶ 2. She has worked for Corp. for sixteen years, as of the date of her declaration on February 5, 2015. *Id.* ¶ 3. She "was trained thoroughly on meal break and rest break policies and it is part of [her] job to make sure that employees take the breaks they are entitled to take." *Id.* ¶ 6. She schedules meal and rest breaks using a "daily organizer sheet" also known as a "DOB." *Id.* ¶ 8. The DOB is kept behind the register and it is one of the first things that employees look at when they begin their shifts. *Id.* "Managers on duty will also verbally remind employees to take their breaks before they are due for a break." *Id.* Ramirez also states that when she is working "all employees entitled to meal breaks take their meal breaks." *Id.* ¶ 9. She never asks employees to skip meal breaks, reminds employees to take meal breaks, and instructs employees to initial the DOB sheet when they come back from their breaks. *Id.* According to Ramirez, "[a]ll employees in our store who are entitled to meal breaks will take their meal breaks about four hours into their shifts, and at the latest, by the fifth hour of work." *Id.* ¶ 10. Ramirez has never seen an employee miss a meal break and if an employee forgets to clock-out before taking a meal break she will edit their time sheet after the fact to reflect the meal break. *Id.* ¶ 11. She does not believe that employees have ever been told not to take rest breaks, has not heard of complaints about the rest breaks, and she has never asked an employee to skip a rest break. *Id.* ¶ 14. Her store has 13 permanent employees and two on-call employees. *Id.* ¶ 4. The permanent employees are comprised of: one store manager, two assistant managers, two floor supervisors, and eight sales associates. *Id.* Managers and floor supervisors work 7.5 hours per shift. *Id.* ¶ 5. Associates work shifts of between 4 and 8 hours. *Id.*

Jennifer Parker is a Site Manager at Corp. Parker Decl. ¶ 2. She has worked for Corp. for twelve years, as of the date of her declaration on February 6, 2015. *Id.* ¶ 3. According to Parker, she "was trained thoroughly on meal break and rest break policies and [views] it as part of [her] responsibility to make sure that employees take the breaks they are entitled to take." *Id.* ¶ 4. The store tracks meal and rest breaks on a "daily organizer sheet." *Id.* ¶ 7. The daily organizer sheet is one of the first things that employees look at when they arrive at work. *Id.* The manager on duty is responsible for ensuring

|  | : |
|---|---|
| Initials of Preparer | |
| | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

employees take all their breaks and the store sometimes also appoints a "break monitor" to verbally remind employees to take meal and rest breaks. *Id.* She does not believe that employees have ever been told not to take rest breaks, has not heard of complaints about the rest breaks, and she has never asked an employee to skip a rest break. *Id.* ¶ 13. Her store has ten permanent employees and five on-call sales associates. *Id.* ¶ 6. The permanent employees are comprised of: one site manager, one assistant manager, two floor supervisors, and six sales associates. *Id.* Managers and floor supervisors work 7.5-hour shifts and sales associates work between 6 and 7.5-hour shifts on average at her store. *Id.*

    Laura Ortiz is a Store Manager at Corp. L. Ortiz Decl. ¶ 3. She has worked for Corp. for around ten years, as of the date of her declaration on February 6, 2015. *Id.* Ortiz "always schedule managers to work overlapping shifts and to make sure there is enough overlap that everyone can take their breaks at the appropriate times." *Id.* ¶ 5. She explains that "[a]s a manager, it is my job to make sure that everyone is on time. I view keeping track of time as part of my responsibilities, and therefore, I remind employees to take their meal breaks at the appropriate time." *Id.* ¶ 8. With respect to rest breaks she stated that "[i]t has always been [her] practice to watch the clock and remind employees to take their rest break on time." *Id.* ¶ 10. Her store has eleven employees, including two on-call employees. *Id.* ¶ 4. The on-call employees "only work when someone is needed to fill a shift." *Id.* The nine regular employees are comprised of: one manager, one manager's assistant, one assistant store manager, two floor supervisors, and four associates. *Id.* Floor Supervisors typically work 7.5-hour shifts. *Id.* ¶ 5. Sales associates typically work between 4 and 5-hour shifts. *Id.*

    Abrienne Ortiz is a Site Manager at Corp. A. Ortiz Decl. ¶ 2. She has worked for Corp. for around seven years, as of the date of her declaration on February 4, 2015. *Id.* She trains new employees regarding meal break rules and makes sure that the schedule permits them to take their meal breaks on time. *Id.* ¶ 7. "On the rare occasions when an employee has worked five hours without taking a break, a note to payroll is sent so that the employee is paid an hour of premium pay." *Id.* With respect to meal breaks, Ortiz "ask[s] employees whether they have taken the breaks they are entitled to each shift." *Id.* ¶ 8. Her store has fifteen employees, comprised of: two full-time assistant managers, a full-time floor supervisor, and eleven sales associates. *Id.* ¶ 4. Assistant managers and floor supervisors typically work 7 to 8-hour shifts. *Id.* ¶ 5. Sales associates typically work between 4 and 5 hours per shift. *Id.*

    Bang Nguyen is a Store Manager at Corp. Nguyen Decl. ¶ 2. She has worked for Corp. for seven years, as of the date of her declaration on February 4, 2015. *Id.* She "was trained thoroughly on meal break and rest break policies and it is part of [her] job to make sure that employees take the breaks

                                                                                          :

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

they entitled to take." *Id.* ¶ 6. Her location uses a "daily organizer sheet" to schedule meal and rest breaks and this is one of the firs things that employees look at before their shifts. *Id.* ¶ 7. Managers on duty will also remind employees that they need to take breaks before the breaks are due. *Id.* She has never asked an employee to skip a meal break and reminds employees roughly five minutes before they are supposed to take their break that it is coming up. *Id.* ¶ 8. "All employees in [her] store who are entitled to meal breaks will take them either *before* their 5th hour of work or at the 5th hour." *Id.* ¶ 9. Nguyen has not seen an employee miss a meal break at her store. *Id.* ¶ 11. If she finds that an employee has forgotten to clock out before taking a meal break, she "will go back and edit their time-sheet to reflect the meal break." *Id.* Store employees know the rest break rules and the breaks "are scheduled on the daily organizer sheet which will indicate whether an employee is entitled to one rest break or more than one rest break based on the length of their shift." *Id.* ¶ 12. She does not believe that employees have ever been told not to take rest breaks, has not heard of complaints about the rest breaks, and she has never asked an employee to skip a rest break. *Id.* ¶ 13. Her store has eighteen employees, comprised of: one store manager, one full-time assistant manager, two part-time floor supervisors, and fourteen sales associates. *Id.* ¶ 4. Managers and floor supervisors work between 6 to 8-hour shifts. *Id.* ¶ 5. Sales associates usually work 5-hour shifts. *Id.*

John Mukul is a Store Manager for Corp. Mukul Decl. ¶ 2. He has worked for Corp. for around nine years, as of the date of her declaration in February 2015. *See id.* He was "trained thoroughly on meal break and rest break policies and it is part of [his] job to make sure that employees take the breaks they are entitled to take." *Id.* ¶ 5. Though his store has no formal scheduling for meal and rest breaks, employees are required to sign or initial on the "daily organizer sheet" to confirm that they took the breaks they were entitled to take. *Id.* ¶ 6. When Mukul is working "all employees entitled to meal breaks take their meal breaks and [he] never ask[s] an associate to skip a meal break." *Id.* ¶ 8. He has never observed an employee from his store miss a meal break. *Id.* ¶ 9. For rest breaks, employees entitled to one rest break "will take their break roughly two hours into their shift" and employees entitled to two breaks "will take the second rest break of hours before they end their shift." *Id.* ¶ 11. He does not believe that employees have ever been told not to take rest breaks, has not heard of complaints about the rest breaks, and he has never asked an employee to skip a rest break. *Id.* ¶ 12. His store has eight employees, comprised of: one store manager, one assistant manager, two floor supervisors, and and four sales associates. *Id.* ¶ 4. Managers work 7.5-hour shifts and sales associates typically work 5-hour shifts. *Id.*

Miranda McCormick is a Site Manager for Corp. McCormick Decl. ¶ 2. She has worked for

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

Corp. for five years, as of the date of her declaration on February 6, 2015. *Id.* She "was trained thoroughly on meal break and rest break policies and it is part of my job to make sure that employees take the breaks they are entitled to take." *Id.* ¶ 5. Her store uses a "daily organizer sheet" to schedule meal and rest breaks. *Id.* ¶ 7. Once the sheet is filled in, "managers on duty will also verbally inform employees when their breaks are scheduled and will remind them throughout the day to take their breaks." *Id.* When McCormick is on duty, "all employees entitled to meal breaks take their meal breaks" and she "never ask[s] an associate to skip a meal break." *Id.* ¶ 8. If an employee fails to record a meal break, McCormick or another manager "will edit their timesheet to reflect the correct time an employee took their meal break." *Id.* ¶ 9. She does not believe that employees have ever been told not to take rest breaks, has not heard of complaints about the rest breaks, and she has never asked an employee to skip a rest break. *Id.* ¶ 12. Her store has ten regular employees, comprised of: one site manager, one assistant manager, two floor supervisors, one lead cashier, and five sales associates. *Id.* ¶ 4. The store also adds additional employees during the holiday season. *Id.* Managers typically work 8-hour shifts and sales associates usually work 4-hour shifts. *Id.* ¶ 4.

Breanne Maggy is a Store Manager for Corp. Maggy Decl. ¶ 2. She has worked for Corp. for over two years, as of the date of her declaration on February 4, 2015. *See id.* ¶ 3. She "was trained thoroughly on meal break and rest break policies and it is part of my job to make sure that employees take the breaks they are entitled to take." *Id.* ¶ 13. Meal and rest breaks are scheduled by the time the store opens each morning and are reflected in the "daily organizer sheet" or "DOB." *Id.* ¶ 14. The DOB is one of the first things that employees check when they arrive to work. *Id.* Based on the times entered in the DOB, "managers on duty in [her] store will verbally remind employees to take their breaks, or will follow up with employees to ensure they took their breaks." *Id.* She ensures that "all employees entitled to meal breaks take their meal breaks" and has "never asked an associate to skip a meal break." *Id.* ¶ 15. She ensures "that all employees entitled to rest breaks take their rest breaks" and has "never asked an employee to skip a rest break." *Id.* ¶ 21. She is not aware of any manager in her store ever telling an employee that they could not take a rest break. *Id.* Her store has fourteen employees, comprised of: one store manager, one assistant manager, three part-time floor supervisors, two stock room employees, and seven sales associates. *Id.* ¶ 4. Managers typically work 7.5-hour shifts and floor supervisors work between 4.5 and 7.5 hours per shift. *Id.* Sales associates generally work 4.5–5 hours per shift but will work 6–7.5 hours on the weekend. *Id.*

Jeremy Harmon has been a Store Manager for Corp since he took the role in July 2014. Harmon Decl. ¶ 2. In his time working at the store, he has witnessed "two or three times when lack of manager

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

coverage has prevented an employee from taking a scheduled meal break." *Id.* ¶ 4. On those occasions, the payroll department was notified and the employee would receive an hour of premium pay. *Id.* Harmon "keep[s] an eye on the time and verbally remind employees to take their meal and rest breaks." *Id.* ¶ 7. His store has eleven employees, comprised of: one store manager, one assistant manager, two floor supervisors, and eight sales associates. *Id.* ¶ 4. Assistant managers and floor supervisors work 7-hour shifts. *Id.* Sales associates typically work 4 to 5-hour shifts. *Id.* ¶ 4.

Emily Falkingham is a Store Manager for Corp. Falkingham Decl. ¶ 2. She has worked for Corp. for thirteen years, as of the date of her declaration on February 6, 2015. *Id.* ¶ 3. She "was trained thoroughly on meal break and rest break policies and it is part of [her] job to make sure that employees take the breaks they are entitled to take." *Id.* ¶ 6. She schedules meal and rest breaks using a "daily organizer sheet" also known as a "DOB." *Id.* ¶ 13. The DOB is kept in a binder at the register and it is one of the first things that employees look at when they begin their shifts. *Id.* Once the DOB is filled in, "managers on duty in [her] store will verbally remind employees to take their breaks, or will follow up with employees after to ensure they took their breaks." *Id.* "The DOB also has spaces for employees to confirm in writing that they indeed took their breaks." *Id.* Falkingham "ensure[s] that all employees entitled to meal breaks take their meal breaks" and she has "never asked an associate to skip a meal break." *Id.* She also reviews "employee shifts, to properly schedule employees to take meal breaks by the end of the fifth hour of work." *Id.* ¶ 15. "If an employee forgets to clock-out for lunch, [Framingham] or another manager will edit their timesheet in pafroll to reflect the correct time an employee took their meal break." *Id.* ¶ 18. She "ensure[s] that all employees entitled to rest breaks take their rest breaks" and she has "never asked an associate to skip a rest break." *Id.* ¶ 19. She does not believe that employees have ever been told not to take rest breaks and has not heard of complaints about the rest breaks. *Id.* ¶ 21. Her store has six regular employees, including one store manager, one assistant manager, two floor supervisors, and two sales associates. *Id.* ¶ 5. The store also employs two part-time college students. *Id.* Managers typically work 6 to 7-hour shifts and sales associates typically work 5-hour shifts. *Id.*

Jeannine Ellis is a Store Manager for Corp. Ellis Decl. ¶ 2. She has worked for Corp. for thirteen years, as of the date of her declaration on February 4, 2015. *Id.* Ellis "train[s] employees to look at the schedule when they come into the store so that they know what time their breaks are scheduled, but [she] also watch[es] the clock and remind[s] employees to take their meal breaks on time." *Id.* ¶ 5. She "tells employees to take the full 30 minutes off and follow[s] up with a verbal reminder if [she] see that someone has clocked back in even a minute before the full 30 minutes is up." *Id.* ¶ 6. The only time that someone misses a meal break is when there is a "staffing emergency." *Id.* In those cases, the non-exempt

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

employee would get premium pay and overtime, if applicable. *Id.* But these emergencies are "rare" and Ellis can only recall "at most five" instances in the last year. *Id.* Most of those instances involved her missing a meal break, and she is an exempt employee. *Id.* Ellis schedules one or two meal breaks into an employee's schedule, depending on how long they are working. *Id.* ¶ 7. She "cannot recall ever telling an employee that he or she could not take a rest break" and has not heard complaints about rest breaks. *Id.* Her store has thirteen employees, comprised of: one store manager, one assistant manager, four floor supervisors, and six sales associates. *Id.* ¶ 4. Assistant managers usually work 8-hour shifts, floor supervisors work 7 to 7.5-hour shifts, and sales associates work 3 to 6 hours per shift. *Id.*

Carrie Cooksey is a Store Manager for Corp. Cooksey Decl. ¶ 2. She has worked for Corp. for around nineteen years, as of the date of her declaration on February 4, 2015. *Id.* ¶ 3. She uses a "daily organizer sheet" to schedule meal breaks. *Id.* ¶ 8. Managers also instruct employees to take their breaks as scheduled. *Id.* Cooksey has "never asked an employee to skip a meal break." *Id.* Cooksey also uses the "daily organizer sheet" to track rest breaks. *See id.* ¶ 10. She ensures that all employees take their scheduled meal and rest breaks by having them sign the "daily organizer sheet" to acknowledge that they too the scheduled breaks. *Id.* ¶ 11. Her store has fourteen employees, comprised of: one manager, one assistant manager, one full-time floor supervisor, one part-time floor supervisor, and ten sales associates. *Id.* ¶ 4. Managers are usually scheduled for 7.5-hour shifts and sales associates are usually scheduled for shifts of 4 to 4.5 hours. *Id.* ¶ 5.

**Legal Standard**

CAFA gives federal district courts original jurisdiction over class actions involving at least 100 class members, with minimal diversity, and an amount in controversy exceeding $5,000,000.[1] 28 U.S.C. § 1332(d). In its notice of removal, a defendant is required only to offer a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). A "defendant's amount-in-controversy allegations should be accepted when not contested by the plaintiff or questioned by the court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014).

There is no antiremoval presumption in CAFA cases. *Dart*, 135 S. Ct. at 554. But when a plaintiff contests a defendant's amount-in-controversy calculation, the defendant still bears the burden of

---

[1] The parties do not dispute that the first two requirements of § 1332(d) have been satisfied. Thus, the only jurisdictional issue is whether the amount-in-controversy requirement has been satisfied.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

establishing that removal was proper by a preponderance of the evidence. *Id.* at 553–54; *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 977 (9th Cir. 2013).

The Ninth Circuit has defined the broad outlines of the process after a plaintiff contests removal jurisdiction under CAFA. "In determining the amount in controversy, courts first look to the complaint." *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). Next, "[t]he parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Id.* (internal quotation marks omitted). This procedure prevents a defendant from establishing federal jurisdiction "by mere speculation and conjecture, with unreasonable assumptions," instead requiring the parties to rely on "real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Id.* at 1197–98.

**Application**

There is limited appellate guidance on how district courts should interpret the evidence presented by the parties. *Duberry v. J. Crew Grp., Inc.*, No. CV 14-8810 SVW (MRW), 2015 WL 4575018, at *2 (C.D. Cal. July 28, 2015). When a party relies on a chain of reasoning that includes assumptions, those assumptions must be reasonable. *Ibarra*, F.3d at 1199 (assumptions "cannot be pulled from thin air but need some reasonable ground underlying them"). Therefore it would be unreasonable to assume a 100% violation rate based only on a plaintiff's allegation of a "pattern and practice" of labor violations. *Id.* at 1198–99 ("a 'pattern and practice' of doing something does not necessarily mean *always* doing something"). But a defendant may establish the amount in controversy by presenting admissible statistical evidence taken from a representative sample and extrapolated to calculate the potential liability for the full class. *See LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202–03 (9th Cir. 2015).

Given these goal posts, district courts have not been entirely consistent in whether they will allow a defendant to reduce the words in a complaint to an assumed violation rate for the purposes of calculating an amount in controversy. *See Duberry*, 2015 WL 4575018, at *2. Some courts faced with a complaint containing indeterminate language have allowed defendants to attach numerical values to the plaintiff's words. *See Sanchez v. The Ritz Carlton*, No. CV 15-3484 PSG (PJW), 2015 WL 4919972, at *4 (C.D. Cal. Aug. 17, 2015) (approving a defendant's assumed violation rates appropriate based on the language of the complaint); *Tajonar v. Echosphere, L.L.C.*, No. 14CV2732-LAB RBB, 2015 WL 4064642, at *4 (S.D. Cal. July 2, 2015) (accepting a defendant's violation rate of less than one percent when the

_____ : _____
Initials of Preparer       PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

complaint arguably suggested a 100% violation rate); *Unutoa v. Interstate Hotels & Resorts, Inc.*, No. 2:14-CV-09809-SVW-PJ, 2015 WL 898512, at *3 (C.D. Cal. Mar. 3, 2015) (finding defendant's assumptions about missed meals and rest periods reasonable); *Oda v. Gucci Am., Inc.*, No. 2:14-CV-07469-SVW, 2015 WL 93335, at *5 (C.D. Cal. Jan. 7, 2015) (finding a 50% violation rate reasonable based on the allegations in the complaint); *Jasso v. Money Mart Exp., Inc.*, No. 11-CV-5500 YGR, 2012 WL 699465, at *6 (N.D. Cal. Mar. 1, 2012) (accepting as reasonable defendant's assumption of one violation per week).  Other courts have refused to attribute a numerical value to vague modifiers without additional evidence supporting the assumed rate.  *See Townsend v. Brinderson Corp.*, No. CV 14-5320 FMO RZX, 2015 WL 3970172, at *6 (C.D. Cal. June 30, 2015) (rejecting 100% violation rate assumption); *Lafountain v. Meridian Senior Living, LLC*, No. CV 15-03297-RGK PJWX, 2015 WL 3948842, at *3 (C.D. Cal. June 29, 2015) (rejecting defendant's assumptions regarding unpaid wages, unpaid overtime, and missed meal and rest periods); *Roth v. Comerica Bank*, 799 F. Supp. 2d 1107, 1126–29 (C.D. Cal. 2010) (rejecting cases that allow a defendant to assume violation rates based only on indeterminate allegations).

      Here, Defendants argue that Plaintiff's complaint places at least $6,441,558.15 in controversy largely based on the Plaintiff's allegations of "consistent" wage-and-hour violations.[2]  *See* Dkt. 17, 1–3. Defendants argue that even with relatively conservative assumed violation rates, the amount in controversy exceeds the jurisdictional minimum.[3]  *Id.* at 7.  Though there is a considerable amount in controversy, the Court finds that Defendants cannot rely on the language of the complaint alone and that Defendants have not offered sufficient evidence to establish the amount in controversy based on a chain of reasoning supported by reasonable assumptions.

    *Unpaid Minimum Wages*

---

[2] Contrary to Defendants' argument, *see* Dkt. 17, 6–7, the Court finds that the language in the complaint is not sufficient to establish a universal practice that would support the assumption of a 100% violation rate.  Doing something "consistently" does not necessarily mean doing it on each and every employee shift.  *See Roth*, 799 F. Supp. at 1126–29 (discussing whether defendants can assume violation rates to fill in the gaps of a plaintiff's broad allegations); *cf. Oda*, 2015 WL 93335, at *4–5 (allowing 50% violation rate assumption based on allegation that policies and procedures "consistently violated California labor laws and regulations").

[3] The Court is mindful that the amount in controversy is "not a prospective assessment of defendant's liability."  *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).  Nonetheless, where the language of the complaint is indeterminate regarding the rate of violations, the Defendant must offer something from which the Court can assess whether a defendant's amount-in-controversy calculation is plausibly reasonable.  *See LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202–03 (9th Cir. 2015).

                                                                                                  :

Initials of Preparer    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

First, Defendants offer a calculation of the amount placed in controversy based on Plaintiff's allegation that Defendants did not pay "all wages, including overtime wages, as a result of, including but not limited to, implementing a practice and/or procedure that unevenly round[ing] time worked," in violation of California Labor Code §§ 510 and 1197. Defendants concede that they "are not yet able to calculate the number of shifts covered by Plaintiff's Complaint," but they offer calculations that would place $149,240 in controversy, based on what they suggest are reasonable assumptions. Dkt. 17, 8–9.

The Defendants' calculations are as follows: there are approximately 552 current PVH employees in California (278 current Corp. employees and 274 current Neckwear employees). *Id.* at 8. Assuming that 25% of those current employees were shorted $2 (fifteen minutes of pay at $8 per hour) for 130 days (five days per week for half a year), the amount placed in controversy would be $35,880. *Id.* at 9. Defendants use similar logic to conclude that 25% of former employees (436 employees assuming, it seems, 133 employees have left Neckwear and 1,610 employees have left Corp.) place $113,360 in controversy.

The problem with these assumptions is that Defendants fail to explain how they arrived at most of the numbers that they rely on and why the Court should find that they are conservative. It is unclear why Defendants have chosen fifteen minutes of pay other than the fact that their payroll system rounded in fifteen-minute increments. But Defendants have not established that an employee that lost one minute of pay would be entitled to a fifteen-minute penalty based on the violation. Further, their selection of five days per week for twenty six weeks appears arbitrary. Defendants have not established that employees worked five-day workweeks and it is unclear why Defendants chose a twenty-six week time period.[4] Finally, Defendants offer no support for the assumption that former and current employees would have the same penalty per employee.

Accordingly, the Court FINDS that Defendants assumptions regarding Plaintiff's minimum wage claim are not reasonable.

*Unpaid Overtime*

Second, Defendants calculate the amount in controversy based on Plaintiff's allegation that employees "were not paid overtime wages for all hours worked" based on Defendants' practices including

---

[4] The Court can only speculate that the unstated assumption is that rounding would reduce an employee's pay approximately 50% of the time.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

"unevenly rounding time worked." Compl. ¶ 32.

Defendants argue that $166,608 was placed in controversy based on this claim. Dkt. 17, 10. To reach this number, Defendants assume that 50% of current employees were not paid the minimum overtime rate ($12 per hour) for 45 minutes per week for 26 workweeks (placing $64,584 in controversy). *Id.* at 9. Next, Defendants assume that 25% of former employees were not paid the minimum overtime rate ($12 per hour) for 45 minutes per week for 26 workweeks (placing $102,024 in controversy). *Id.* at 9–10.

The Court cannot discern reasonable grounds underlying many of these assumptions. Even under Defendants' own rather optimistic interpretation of its Store Manager declarations only "approximately 33% of non-exempt employees work six hours or more per shift, while 66% typically work less than six hours (but generally at least four hours)." Dkt. 17, 11. A more critical review of the Store Manager declarations finds that only one of the thirteen declarations states that some sales associates work up to an eight hour shift. And though Neckwear employees are "almost always" scheduled to work eight-hour shifts and "occasionally" work more than ten hours at the request of their managers, Winkler Decl. ¶ 7, Defendants fail to differentiate between employees from the two companies. More importantly, Defendants do not offer any logical basis for the number of overtime-eligible hours worked. Even if Defendants could assume a 100% violation rate based on the language of the complaint, the question remains how often Defendants were in a position that required overtime pay. Defendants' assumptions of 45 minutes of unpaid overtime for 26 workweeks have no basis in the complaint or in their evidence. At most, Defendants offer evidence that some non-exempt employees "occasionally" worked overtime, and some portion of which would have been not paid in full based on their rounding practices.

Accordingly, the Court FINDS that Defendants assumptions regarding Plaintiff's overtime pay claim are not reasonable.

*Meal and Rest Breaks*

Third, Defendants calculate the amount in controversy based on Plaintiff's allegation that class members were not provided with meal and rest breaks. Compl. ¶¶ 41, 48.

Defendants calculate $569,273.12 in controversy from Plaintiff's meal break claim and $453,377 from the rest break claim. Dkt. 17, 12. To reach these numbers, Defendants assume that all Neckwear

|  | : |
|---|---|
| Initials of Preparer | |
| | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

employees since January 22, 2011 missed two meal breaks per week for 26 weeks. *Id.* at 11. Next, based on the Store Manager declarations, Defendants assume that approximately 33% of non-exempt Corp. employees since January 22, 2011 were eligible for meal breaks and that they each missed two meal breaks per week for 26 weeks. *Id.* at 11–12. Defendants apply those employees' average pay rates to reach a total amount in controversy of $569,273.12. *Id.* at 12. Defendants calculate the amount in controversy for rest break claims by assuming that all current and former employees were eligible for at least one rest break and assuming each employee missed 20 rest breaks. *Id.* Based on these assumptions, Defendants calculate $453,377 was placed in controversy by this claim. *Id.*

      The Court rejects Defendants' meal and rest break amount-in-controversy calculations because they are inconsistent with the evidence submitted with their opposition to the motion to remand. Defendants calculate potential meal break penalties based on the assumption that Neckwear and Corp employees each missed two meal breaks every 26 weeks. Dkt. 17, 11. While this may appear to be a conservative estimate, plausibly supported by the broad allegations in the complaint, it is directly contradicted by the declarations of Defendants' Store Managers.[5] The Store Managers provide uncontroverted evidence that meal break violations were extremely rare.

      For example, Jeanne Ellis manages a thirteen-person store. Ellis Decl. ¶ 4. She estimated that there have been around five skipped meal breaks in the last year. *Id.* ¶ 6. Of those missed meal breaks, it is unclear whether meal break penalties would apply. Ellis, an exempt employee, estimated that she personally missed at least three of the meal breaks in question. *Id.* The other employees who missed meal breaks were paid premium time and overtime pay, if applicable. *Id.* Thus, not only are Defendants' meal break assumptions untethered to any evidence before the Court, they are inconsistent with Defendants' submissions. The declaration of Jeremy Harmon supports a similarly low violation rate. Harmon stated that in the six months he had been at his store he had witnessed "two or three times when lack of manager coverage has prevented an employee from taking a scheduled meal break." Harmon Decl. ¶ 4. On those occasions, the payroll department was notified and the employee would receive an hour of premium pay. *Id.*

      Similarly, Defendants' rest break violation assumptions are not reasonable given the declarations of the Store Managers. Defendants assume that every current and former employee missed twenty meal

---

[5] Plaintiff has alleged a joint-employer relationship with Corp. and Neckwear. Because Corp. and Neckwear are related entities, the Court finds that it is more likely that their meal and rest break practices are consistent than divergent. Thus, in the absence of evidence to the contrary, the Court finds that the violation rate for each entity should be the same.

                                                                           :

Initials of Preparer    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

breaks during the four-year rest period class. As with the meal break calculation, this assumption is directly contradicted by the Store Manager declarations. Store Managers are trained in meal and rest break rules, and believe it is their responsibility to comply with these rules. To comply with the rules, Store Managers take a number of precautions. Many of the stores utilize daily organizer sheets to make sure that managers and employees are aware of scheduled breaks. In the stores that use daily organizer sheets, the sheet is one of the first things that employees look at when they arrive at the store. A number of stores require employees to sign or initial the daily organizer sheets to ensure that the employee actually took their scheduled breaks. Store Mangers verbally instruct employees to take meal breaks before they are scheduled. And a number of Store Managers stated that they have "never" told employees not to take a rest break, have not heard of others telling employees not to take a rest break, and have not heard employees complain about not receiving a scheduled rest break. This evidence is simply not consistent with Defendants assumptions.[6]

Accordingly, the Court FINDS that Defendants assumptions regarding Plaintiff's meal and rest break claims are not reasonable.

*Late Pay Penalties*

Next, Defendants calculate the amount in controversy based on Plaintiff's allegation that Defendants failed to employees all the wages that they had earned but not yet been paid upon termination. Compl. ¶ 66.

Defendants calculate the amount in controversy for late pay penalties based on stated and unstated assumptions applied to company data. Defendants calculate the number of employees potentially entitled to late pay penalties based on the number of employees that have left the company in the three-year period from January 22, 2012 until the present. Defendants' declarations state that 1,407 ended their employment with Corp., David Decl. ¶ 5c, and 85 employees ended their employment with Neckwear, Winkler Decl. ¶ 5c, since January 22, 2012. Next, Defendants calculate the average hourly

---

[6] Even if the evidence provided by the Store Managers did not act to refute the assumption that meal break violations occur at the rate that Defendants assume, the assumption is exactly the sort of assumption "pulled from thin air" that is disapproved by *Ibarra*. *See* 775 F.3d at 1199. Because Defendants do not even state how many eligible shifts took place during the four-year class period, there is no basis to assess what violation rate Defendants' assumption suggests. Whether or not the assumption is ultimately accurate, Defendants have failed to support the assumption with "reasonable ground underlying [it]." *Id.*

|  | : |
|---|---|
| Initials of Preparer | |
| | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

pay for non-exempt employees over the last four years.[7] Defendants' declarations state that the average non-exempt employee at Corp. earned $ 9.31 per hour, David Decl. ¶ 5e, and the average non-exempt employee at Neckwear earned $12.51 per hour, Winkler Decl. ¶ 5d. Next, Defendants assume that the average employee leaving the companies would have worked 30 hours per week. And finally, Defendants assume that, based on Plaintiff's allegation of "consistent" violations, that 75% of employees leaving the company would be entitled to late pay penalties.

The Court finds that Defendant's chain of reasoning breaks down in the final two steps. While Defendants are not required to present evidence with the same level of precision as they might for other purposes, their estimates must still be plausibly accurate. Here, some of Defendants' estimates miss the mark. It appears that Defendant assumed that non-exempt employees worked an average of 30 hours per week based on their characterization of the Store Manager declarations as providing "that employees rarely work less than four hours and a sizable percentage work full-time." Dkt. 17, 13. This assumption is not supported by Defendant's evidence. If anything, the Store Manager declarations support the inference that many non-exempt Corp. employees are part-time workers.[8] And the Court finds that most sales associates, the most common (and presumably non-exempt) job title worked between 4.5 and 5.5 hours per shift on average.[9] Thus, even if the Court were to assume, without a factual basis, that the average Corp. employee worked five days per week on average, Defendant's estimate would still overstate the number of hours worked by an average Corp. employee. And though the Winkler

---

[7] Though this is not precisely the relevant time period, the Court does not find any reason to believe that the average wage would necessarily inflate the amount in controversy.

[8] Abrienne Ortiz implied that the sales associates at her store were not full-time employees when she stated "[t]he Van Heusen store has about 15 employees total. They include two full-time assistant managers, a full-time floor supervisor, and 11 sales associates." A. Ortiz Decl. ¶ 4. Laura Ortiz stated that her store has two on-call workers who "only work when someone is needed to fill a shift." L. Ortiz Decl. ¶ 4. Miranda McCormick stated that her store adds additional employees during the holiday season. McCormick Decl. ¶ 4. Emily Falkingham stated that her store has two employees who are college students that work a limited or seasonal schedule. See Falkingham Decl. ¶ 5. Jennifer Parker stated that she has five on-call sales associates. Parker Decl. ¶ 6.

[9] The Store Managers stated the number of regular sale associates at their stores and the number of hours that they will usually schedule for sales associates. Schneider: 7 sale associates at 5 hours; Ramirez: 8 sale associates at 4–8 hours; Parker: 6 sale associates at 6–7.5 hours per shift; L. Ortiz: 4 sale associates at 4–5 hours per shift; A. Ortiz: 11 sale associates at 4–5 hours per shift; Nguyen: 14 sale associates at 5 hours per shift; Mukul: 4 sale associates at 5 hours per shift; McCormick: 5 sale associates at 4 hours per shift; Maggy: 7 sale associates at 4.5–5 hours per shift; Harmon: 8 sale associates at 4–5 hours per shift; Falkingham: 2 sale associates at 5 hours per shift; Ellis: 6 sale associates at 4–4.5 hours per shift; Cooksey: 10 sale associates at 4–4.5 hours per shift. Thus, on this evidence, the Court finds that Corp. sales associates were scheduled to work between 4.46 and 5.28 hours per shift on average.

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

declaration provides support for the assumption that non-exempt Neckwear employees work in eight-hour shifts, it does not provide any basis for saying that they worked any more or less than 30 hours per week. See Winkler Decl. ¶ 7. The Court is not in the position to take judicial notice of how many shifts are usually scheduled for a non-exempt employee in the necktie manufacturing and distribution business.

Defendants' late pay penalty calculation breaks down further based on their interpretation of the word "consistent." Because the Court has found that the word "consistent" does not logically require or allow a 100% violation rate assumption, Defendants must do more than pull numbers out of thin air in support of their assumed violation rate. Here, Defendants' reliance on the purportedly conservative assumption of a 75% violation rate undermined by the evidence that Defendants offer through their Store Manager declarations. Defendants attempt to justify their assumed error rate in part based on the supposition that "[a]ny individual missed meal or rest break or even slight underpayment of wages during the last three years could trigger potential penalties for employees who stopped working for Defendants." Dkt. 17, 13. But given that Defendants' own evidence undermines the frequency of meal and rest break violations, the Court cannot credit this estimate on the basis of the language of the complaint or a logical chain of reasoning.

Accordingly, the Court FINDS that Defendants assumptions regarding Plaintiff's late pay claim are not reasonable.

*Wage Statement Penalties*

Finally, Defendants calculate the amount in controversy based on Plaintiff's allegation that Defendants failed to provide current and former employees, employed at some time from January 22, 2014 to present, with accurate itemized wage statements as required by California Labor Code § 226. Compl. ¶¶ 20, 57. Section 226 provides that a plaintiff is entitled to recover the greater of actual damages or "fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000)." Cal. Lab. Code § 226(e).

Defendants calculate that $2,508,000 was put in controversy by this claim, based on the assumption that 75% of non-exempt employees at the companies between January 22, 2014 and the present would be eligible for the statutory maximum penalty of $4,000 under § 226. Dkt. 17, 14–15. They find the number of employees based on the average number of employees at both companies from

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

January 22, 2014 to present.  See Winkler Decl. ¶ 5b; David Decl. ¶ 5d.  Defendants estimate that an employee would only have to work 9.5 months to meet the statutory maximum because the companies provide employees with weekly wage statements.  Dkt. 17, 14; David Decl. ¶ 7; Winkler Decl. ¶ 8.

The Court finds that the wage statement amount-in-controversy calculation is not reasonable.  First, as Plaintiff notes, the employee turnover rate at Corp. is staggering.  In the approximately three-year period covered by Carla David's declaration Corp. lost 1407 employees.  David Decl. ¶ 5c.  Thus, assuming that David's declaration was accurate as of May 4, 2015, Corp. has lost just under 430 employees per year over the period indicated in the declaration.  Based on an average employee population of 562, David Decl. ¶ 5d, the Court finds that the assumption that 75% of Corp. employees would have worked long enough to subject Defendants to the statutory maximum penalty is not reasonable.  Whether Corp.'s employment swells during the holiday season or it simply has a naturally high turnover rate, Defendants overestimate the percentage of Corp. employees eligible for the statutory maximum penalty.

Second, Defendants make no effort to substantiate their assumed violation rate.  Implicit in Defendants' calculation that an employee that worked approximately 9.5 months would be eligible for the statutory maximum penalty is the assumption that there was a predicate violation in 100% of employee wage statements.  As discussed above, this assumption is not warranted based on the specific facts of this case.  Defendants make no effort to quantify the number of purported predicate violations in some way based on the allegations or evidence.  See Dittmar v. Costco Wholesale Corp., No. 14-CV-1156-LAB-JLB, 2015 WL 7106636, at *5 (S.D. Cal. Nov. 13, 2015) (approving a defendant's amount-in-controversy calculation of $695 per class member for wage statement claims where the defendant made "conservative" estimates of the frequency of underlying violations).

Accordingly, the Court FINDS that Defendants assumptions regarding Plaintiff's wage statement claim are not reasonable.

*Attorney's Fees*

Because the underlying California statutes provide for attorneys' fees, they are properly considered as a part of the amount in controversy.  *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007), *overruled on other grounds as recognized by Rodriguez v. AT & T Mobility Serv. LLC*, 728 F.3d 975, 976–77 (9th Cir. 2013).  But given the Court's other findings, even assuming

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:15-cv-02266-SVW-AS | Date | December 14, 2015 |
|---|---|---|---|
| Title | Rosario J. Lopez v. PVH Corp. et al | | |

*arguendo*, that the Court should also include attorney fees of 25%, that would still be insufficient to meet the amount in controversy requirement. *Amaya v. Consol. Container Co., LP*, No. 2:15-CV-03369-SVW-PLA, 2015 WL 4574909, at *4 (C.D. Cal. July 28, 2015). Based on the evidence presented by the parties, the Court is unable to conclude that it is more likely than not Plaintiff's substantive claims place at least $4 million in controversy. Thus, even if the Court applied a 25% multiplier on the amount in controversy, Defendants would fall short of meeting their burden of establishing that the amount in controversy exceeds $5 million.

**Conclusion**

For the aforementioned reasons, the Court GRANTS Plaintiff's motion to remand the action and REMANDS the case to California Superior Court.[10]

**IT IS SO ORDERED.**

---

[10] Because the Court finds that it lacks subject matter jurisdiction over this matter, the Court does not reach the pending motions filed by each party. Dkts. 44, 46, 47.

:

Initials of Preparer    PMC